IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>            Plaintiff,<br><br>vs.<br><br>Elizabeth Gabriela Szilagyi,<br><br>            Defendant. | No. CR-13-0116-PHX-DGC<br><br>**DETENTION ORDER** |

On February 4, 2016, Defendant Elizabeth Szilagyi, a United States citizen, was temporarily extradited from Swiss custody on unspecified charges to the District of Arizona to face prosecution in this case. The Government requests Defendant be detained based upon the United States' Treaty obligation that Defendant remain in custody during the period of her temporary extradition. Alternatively, the Government requests Defendant's detention as a flight risk.

The Court heard argument from the parties on February 19 and February 26, 2016. The Court has also considered the memoranda, exhibits, proffers, and argument of the parties. The Court finds mandatory detention under the Treaty is not required unless more facts are presented, but Defendant's detention as a flight risk is required under the Bail Reform Act.

**I.   Factual and Procedural Background**

Defendant, age 72, is a naturalized citizen since 1994 who holds dual citizenship

with Hungary. She is a financial advisor who assists clients to obtain funding for international, commercial ventures. She has no domestic criminal history. On October 30, 2013, a Superseding Indictment charged Defendant with 35 counts of Wire Fraud. The Superseding Indictment alleges that between 2004 and 2013, Defendant engaged in wire fraud transactions in an amount over $433,000. (Doc. 14.)[1]

On August 14, 2011, Defendant left the United States for the stated purpose of assisting her ill mother who resided in Hungary. (Docs. 36-2 at 8, 36-3 at 4.) On September 15, 2011, Defendant returned to the United States. (Doc. 36-2 at 8.) Defendant's Motion in Support of Pretrial Release asserts that in "October of 2011, Ms. Szilagyi traveled to Zurich and secured an apartment there." (Doc. 35 at 3.) Defendant asserts she stayed in Zurich in part because of her mother's health, and also for "personal and business reasons." (Doc. 35 at 4.) Defendant's activities in Zurich are not known to the Court, and the Court does not know the extent of Defendant's travel to Hungary. Defendant obtained a Hungarian passport in 2012, and a Hungarian license in 2013. (Doc. 36-2 at 10.) Defendant is not in physical possession of the Hungarian passport, but its actual location is unknown to the Court.

Defendant resided in Zurich from October 2011 until her arrest by Swiss authorities on or before December 24, 2014 (the date the Government of Switzerland granted the Government's first extradition request). Letters from Michael McNamara and Martin Fortier, submitted by Defendant, indicate that period of custody began in October or November of 2014. (Doc. 35-1 at 1; Defendant's Ex. 5.) Neither party was able to inform the Court of the nature of the investigation, what charges were filed against Defendant, her arrest date, or the present status of the Swiss matter. In the "Declaration of Elizabeth Kiingi" (Department of State Legal Advisor), Ms. Kiingi avows that "the Government of Switzerland informed the United States that Ms. Szilagyi

---

[1] In an affidavit in support of extradition, F.B.I. Special Agent Janik summarized the total amount "sent" to Defendant was an "estimated $1,157,000 USD." (Doc. 24 at 25.) The government asserts she "received over $1.1 million from her victims." (Doc. 36 at 4.)

had been detained exclusively on Swiss-related charges before her surrender to the United States…." (Doc. 36-1 at 4.)

On October 1, 2014, the Government requested Defendant's extradition. (Doc. 36-1 at 2.) On February 4, 2015, the Government was informed that extradition had been granted on December 24, 2014, but would be postponed until "the end of her detention in Switzerland on Swiss-related charges." (*Id*.) On January 29, 2016, the Government requested "temporary surrender" of Defendant, which was subsequently granted. (*Id*.) Ms. Kiingi avows it is the understanding of the Swiss government "that the time Ms. Szilgyi spends in U.S. custody will 'count exclusively' towards U.S. proceedings." (Doc. 36-1 at 4.)

**II.     Mandatory Detention Pursuant to the Swiss Extradition Treaty**

The Government requests Defendant's mandatory detention because she was temporarily released under Article 15(b) of the United States-Swiss Confederation Extradition Treaty ("Treaty"). (*See* Doc. 36-1 at 26.) The Government submits Ms. Kiingi's Declaration that "the United States confirmed [to the Swiss Government] that Ms. Szilagyi would be kept in custody during the pendency of the U.S. criminal proceedings and returned to Switzerland at the conclusion of those, unless subsequently advised by the Government of Switzerland that Ms. Szilagyi's return was not necessary." (Doc. 36-1 at 2.)

Defendant asserts that the Treaty is not relevant in this case because Ms. Kiingi's affidavit suggests Defendant would not be extradited until the end of her detention in Switzerland. (Doc. 35 at 3.) Defendant asserts that since Defendant was extradited, her "possible detention there has concluded." (*Id*.) But the record reflects two extradition requests. The first extradition request was granted on December 24, 2014, but would not take effect until the end of Defendant's Swiss detention. The Government's subsequent "temporary extradition" request on January 29, 2016, is what prompted Defendant's

transport to Arizona.[2] Because Defendant is here under "temporary extradition," the Treaty is relevant.

The Court finds that the record does not support mandatory detention under the Extradition Treaty because the Government could not avow Defendant would be immediately returned to Switzerland if she was released in this case. Although the Treaty requires Defendant remain in custody, there is no detainer on her currently, and it is possible that Swiss authorities could advise that Defendant's return to Switzerland is not necessary. While it is possible the Government could present evidence to conclusively establish Defendant's mandatory transport to Switzerland if released in this case, the record does not presently support that finding.[3] The Court is not predisposed toward mandatory detention, and the record does not support such detention at this time.[4]

## III. The Bail Reform Act

The Government also seeks the detention of Defendant on the ground that she is a

---

[2] Defendant was extradited under Article 15(b) of the Treaty:

> If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the territory of the Requested State for a different offense, the Requested State may: Temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody while in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person in accordance with conditions to be determined by mutual agreement of the Contracting Parties.

(Doc. 36-1 at 26.)

[3] The record is devoid of information related to the Swiss matter. It is possible that charges were dismissed, or conversely that Defendant was convicted of an offense and is serving a sentence. If Defendant is serving a sentence of imprisonment in Switzerland, then mandatory detention may be required. If the Government could prove Defendant's release in this case would result in her automatic transport to Switzerland, then her detention could be required under the Treaty. It would make little sense to release her in this matter, only to require the Government to begin extradition from Switzerland anew.

[4] Because the Court does not find Defendant's detention is mandatory, the need to distinguish *United States v. Santos-Flores*, 794 F.3d 1088, 1091 (9th Cir. 2015) (stating "the government may not use its discretionary power of removal to trump a defendant's right to an individualized determination under the Bail Reform Act") is not presently before the Court.

serious flight risk and no release condition or combination of conditions exist that would reasonably assure her appearance at future court proceedings if released. After considering the memoranda, exhibits, proffers, argument, and all of the factors set forth in 18 U.S.C. §3142(g), the Court finds that the Government has proven by a preponderance of the evidence that Ms. Szilagyi is a serious flight risk and no combination of conditions exist that would reasonably assure her appearance at future court proceedings.

### a.  Standard of Review

The Bail Reform Act, 18 U.S.C. §§ 3141-3150, mandates the release of a person pending trial unless the court "[f]inds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (quoting 18 U.S.C. § 3142(e)). This Court engages in a two-step inquiry before ordering a defendant either be released or detained pending trial. First, the Court must determine whether the defendant presents a "serious risk that [the defendant] will flee," if released from custody. 18 U.S.C. § 3142(f)(2)(A)). Second, if the defendant is likely to flee, the Court must determine whether some set of conditions would sufficiently vitiate that risk. 18 U.S.C. § 3142(g). The government bears the burden of showing by a preponderance of the evidence that the defendant poses a flight risk. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

In determining whether release conditions exist that would reasonably assure a defendant's appearance, Section 3142(g) requires a district court to consider the following factors:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g). "Only in rare circumstances should release be denied," and any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

### b. Risk of Flight

Ms. Szilagyi is an intelligent, accomplished businesswoman who appears to have led an exemplary life until her mid-60's. She became an American citizen in 1994, worked in international finance, and raised two children. She earned the trust and respect of many in her community. Two of those individuals, Gary and Sherrie Gibbs, were present in court for both detention hearings in this case. Both would attest to Defendant's integrity and are willing to act as third-party custodians for Defendant. Defendant's son, Otto Kreidl, a law-enforcement officer in California, was present in court for the second hearing and is also willing to serve as a third-party custodian.

The government argues that from 2004 to 2013, Defendant abused the trust of many victims when she engaged in wire fraud involving payments of over $1,000,000. The government submits Defendant converted the payments from victim-clients for her own personal use. The government further argues Defendant realized she was under investigation and fled the country to reside in Zurich, Switzerland.

Defendant left the United States in October 2011 and never voluntarily returned. She took up residence in Zurich and obtained a Hungarian passport and license. Defendant's son (Mr. Kreidl) and Martin Fortier would testify that Defendant told them (just before her arrest in Switzerland) that she intended to return to the United States. But

this is a claim Defendant also made to the District Court in the Middle District of North Carolina on July 23, 2012 (see below), and Defendant did not return to the United States.

On December 18, 2009, *Immunoscience v. Elizabeth Szilagyi & SZB Corporation*, No. 09-cv-00973-NCT-JEP, was filed in the Middle District of North Carolina.[5]  Default was entered against Defendant.  (Doc. 36-3 at 2, 11.)  The case was subsequently dismissed on January 2, 2013.  (Defendant's Ex. 4.)  Regardless of the merits of the lawsuit, Defendant did not personally appear for the case (Doc. 36-2 at 8), and Defendant acknowledges that she had no more connection to the case "since leaving on August 14, 2011" (Doc. 36-3 at 4). Importantly, in an affidavit to the District Court in North Carolina, Defendant avowed on July 23, 2012, that "I am working very hard to return home to [the] United States as soon as possible."  (Doc. 36-3 at 4.)

Defendant maintained a primary residence in Avondale, Arizona (Doc. 35-1 at 1) until the house was foreclosed after Defendant left the United States. Defendant made a payment on the house immediately before her departure, but a further lack of payment resulted in foreclosure. Defendant initially asserted the foreclosure was a result of the government freezing Defendant's assets (Doc. 35 at 4), but the government denied freezing the accounts.  At the hearing, Defendant asserted the foreclosure was perhaps due to a conflict between Defendant and her daughter.  Defendant does not have contact with her daughter, who resides in Arizona.  It is undisputed that Defendant does not maintain a residence in Arizona.

The Court finds that Defendant is a serious flight risk if she is released.  Defendant does not work or live in the United States.  She left the United States in 2011 and did not voluntarily return.  Defendant's Arizona home was foreclosed.  She resides in Zurich and conducts her business in Europe.  She obtained a Hungarian passport and driver's license. She maintained email contact with her son while she lived in Zurich, and has no

---

[5] A related case, *F.L. Crutchfield Jr. v. Immunoscience & Sateesh Apte*, 08-cv-00561-NCT-JEP, was previously filed in the Middle District of North Carolina in 2008, and was consolidated with the 2009 case. (Doc. 36-3 at 3.)

meaningful contact with her daughter. On July 23, 2012, Defendant told the District Court in North Carolina that she intended to return to the United States, but she never voluntarily did so. Contrary to Defendant's claim that she intended to return the United States, the evidence demonstrates Defendant began life anew in Zurich in 2011.

### c. Factors to Consider If Conditions Exist to Reasonably Assure Appearance

#### i. Nature and Circumstances of the Crimes Charged

The Superseding Indictment and Declaration of Special Agent Armstrong (Doc. 36-2 at 2-13) allege sophisticated criminal conduct based upon Defendant's fraud. The Government alleges substantial monetary loss to at least 12 victims. (Doc. 36-2 at 3.) Defendant's conduct also involved international travel. In one case, a victim ("FD") traveled to Lichtenstein to meet with Defendant and a banking official. (Doc. 36-2 at 4.) In another case, Defendant was paid to travel to Hong Kong to "establish bank accounts." (Doc. 36-2 at 5.) She was also paid to travel to China and Malaysia. (Doc. 36-2 at 4.) In sum, the nature of the offenses alleges significant fraud and the evidence documents Defendant's experience with international banking and travel.

Defendant is presumed innocent, but the possible punishment in a case involving 35 counts and potentially over $1,000,000 of loss is significant. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("[T]he defendants are charged with multiple counts, and it is reasonable, from their perspective, to look at the potential maximum sentences they face if they were found guilty on each count and sentenced consecutively on each count. . . Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."). The Court finds that in light of the serious nature and circumstances of the crimes charged, the first § 3142(g) factor favors the Government's detention request.

#### ii. Weight of the Evidence Against Defendant

Of the four detention factors a court must consider, the weight of the evidence is the least important of the factors. *Motamedi*, 767 F.2d at 1407. The Court is also

mindful that, here, Defendant has had minimal time to review the evidence compared to the Government, who has investigated this case for several years. Nonetheless, the weight of the evidence favors the Government. The Declaration of Special Agent Armstrong (Doc. 36-2 at 2-13) outlines a multi-year investigation of Defendant's conduct. According to the Declaration, numerous victims have alleged a consistent pattern of fraud related to Defendant's conduct. The Court finds the second § 3142(g) factor favors the Government, and no set of release conditions would reasonably assure Defendant's appearance at trial or other court proceedings if she were released.

### iii. History and Characteristics of Defendant

As reflected above, until her mid-60's, Defendant led what appears to be an exemplary life. But Defendant's departure from the United States in 2011 reflects a significant change in her circumstances. Defendant was under investigation for fraud and theft, and told a witness ("MM") she "believed she was under investigation and that someone might be listening to her calls." (Doc. 36-2 at 8.) She asserts she left to care for her mother in Hungary, but took residence in Zurich. In 2012, she claimed "extenuating circumstances beyond her control have required me to remain in Europe" but there is no information before the Court that any circumstances required her to reside there. She did not voluntary return to the United States.

Defendant has sophisticated international business experience. She has maintained foreign bank accounts since at least 2008. (Doc. 13 at 4.) Defendant avows she has had the same Swiss telephone number for 20 years. (Doc. 25 at 2.) The Declaration of Ms. Kiingi demonstrates that Swiss charges resulted in Defendant's Swiss confinement. The Court finds that Defendant's recent history, strong international ties, and minimal ties to Arizona (her son resides in California) currently demonstrate this factor favors detention. *See United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990) (noting the defendant's foreign contacts as a key factor in its decision to affirm pretrial detention).

### iv. Nature and Seriousness of the Danger to Others if Defendant Were Released

This factor does not favor detention. Defendant is undoubtedly not a physical danger to anyone in the community. Defendant may be an economic danger to the community, which the Court may consider. *See United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992) (defendant convicted of mail fraud under 18 U.S.C. § 1341 posed an economic or pecuniary danger to the community). But Defendant was the subject of a multi-year investigation by the FBI, who interviewed numerous witnesses regarding her conduct. The charges in the Superseding Indictment are public. While Defendant may be an economic danger, that fact is significantly diminished by the public nature of the investigation and this case.

In conclusion, based upon a balancing of the four detention factors, the evidence, and proffers presented, the Court finds that the Government has sustained its burden of proof by a preponderance of the evidence that Defendant is a serious flight risk.

### d. Conditions of Release

The Court has considered whether alternatives to custody would suffice in this case. The Court considered GPS monitoring but finds it unsuitable to ameliorate Defendant's risk of flight. If Defendant intended to flee, the GPS device could easily be removed. The device would not prevent Defendant from obtaining a Hungarian passport if she chose to do so (either by having her previous passport mailed to her or by requesting a new passport), and then boarding a plane to Europe. There is no evidence Defendant intends to obtain a Hungarian passport, but the question is whether a GPS device would prevent her from doing so. A GPS device would not prevent her from fleeing, and thus does not ameliorate her risk of flight.

### IV. Conclusion

The Court concludes that there are no combination of release conditions that would reasonably assure Defendant's appearance as required. Defendant does not reside in Arizona, and her prior home in Arizona was foreclosed. Defendant has not voluntarily

returned to the United States since she left in 2011. She obtained a Hungarian passport and license. Defendant lived in Zurich for at least two years prior to her arrest by Swiss authorities. The serious nature of the charges and the evidence before the Court demonstrate Defendant is a serious flight risk. Therefore, the Court finds that the Government has sustained its burden of proof by a preponderance of the evidence that Defendant is a serious flight risk and that no condition or combination of release conditions would reasonably assure her appearance at future court proceedings if she were released.

Accordingly,

**IT IS ORDERED** detaining Defendant as a flight risk.

**IT IS FURTHER ORDERED** Defendant's Motion in Support of Pretrial Release (Doc. 35) is denied.

Dated this 1st day of March, 2016.

Honorable John Z. Boyle
United States Magistrate Judge